690 F.2d 411
 1982-2 Trade Cases 64,968
 ALLEGHENY PEPSI-COLA BOTTLING COMPANY, Appellant,
v.
MID-ATLANTIC COCA-COLA BOTTLING COMPANY, INC.; The Coca-Cola
Company; Bottle Management Corporation; Frank A.
Grisanti and Andrew Galef, Appellees.
 No. 82-1017.
 United States Court of Appeals,
Fourth Circuit.
 Argued Sept. 2, 1982.
Decided Oct. 4, 1982.
 
 Harvey D. Myerson, New York City (Bruce Topman, Lloyd S. Clareman, Arthur H. Ruegger, Daniel J. Cooper, Webster & Sheffield, New York City, Charles R. Waters, II, Kaufman & Canoles, Norfolk, Va., on brief), for appellant.
 Richard J. Wertheimer, Washington, D. C. (Kenneth A. Letzler, Robert N. Weiner, Kathleen C. Kauffman, Arnold & Porter, Washington, D. C., Wm. T. Prince, Williams, Worrell, Kelly & Greer, Norfolk, Va., on brief); Mark A. Belnick, New York City (Stuart Robinowitz, Earl H. Doppelt, Richard A. Rosen, Dennis H. Tracey, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, C. Michael Montgomery, Joel Kolodny, Seawell, Dalton, Hughes & Timms, Norfolk, Va., on brief), for appellees.
 Before BUTZNER, PHILLIPS, and MURNAGHAN, Circuit Judges.
 MURNAGHAN, Circuit Judge:
 
 
 1
 Plaintiff Allegheny Pepsi-Cola Bottling Company (Allegheny) appeals from a judgment in an anti-trust action in favor of defendants Mid-Atlantic Coca-Cola Bottling Company (Mid-Atlantic), the Coca-Cola Company (Coca-Cola), and three other defendants. Allegheny contends that the trial was marred by serious procedural and substantive defects. We have concluded that, while the district judge pursued a commendable and prudent course calculated to avoid the necessity for retrial should he be in error, by letting the case go to the jury, in actuality the entry of a directed verdict in defendants' favor would have been proper. Since any error that may have occurred at trial was harmless, we affirm.
 
 I.
 
 2
 Allegheny is a regional bottler of Pepsi-Cola soft drinks. Prior to June, 1980, its principal competitors were the James E. Crass Coca-Cola Bottling Companies in Virginia and Pennsylvania (Crass), and the Coca-Cola Bottling Company of Baltimore (Baltimore Coke). Baltimore Coke, a wholly owned subsidiary of Coca-Cola, enjoyed a commanding lead in the market for home and cold drinks[1] for all relevant years. Competition between Crass and Allegheny was relatively balanced.
 
 
 3
 In late 1978, Coca-Cola learned that the owners of Crass had decided to sell out. Coca-Cola had a considerable interest in determining who would purchase Crass. Under Coca-Cola's franchise agreements, its syrup prices were fixed at 1921 levels, adjustable only for sugar prices, without any ameliorative provisions to allow for inflationary impacts on other elements of cost. The company had asked its bottlers to amend the contract, but Crass had refused to do so, and Coca-Cola hoped Crass' purchaser would be willing to agree to an amendment. Moreover, Coca-Cola relies heavily on bottling companies to market its products. One possible purchaser of Crass was Northwest Industries, Inc., which had recently acquired the Los Angeles Coca-Cola bottler. Northwest had refused to update syrup prices, and had in other respects performed in a manner deemed by Coca-Cola to be inadequate. Accordingly, Coca-Cola management determined to search for a suitable purchaser of Crass.
 
 
 4
 As of August, 1979, Coca-Cola's search for a purchaser had been fruitless. In a series of memoranda and conversations between Leonard Shaykin of Citicorp Venture Capital, Ltd. (CVC), and Lawrence Cowart and Andrew Christen, Coca-Cola executives, an alternative emerged. Shaykin suggested arranging to transfer Crass to entrepreneurs on an interim basis through a highly leveraged purchase. The proposal was described as a "parking" arrangement-Crass would be "parked" under the direction of the entrepreneurs for some period of time until Coca-Cola could locate a suitable owner. CVC recommended Andrew Galef and Frank Grisanti as interim operators. Coca-Cola adopted the plan.
 
 
 5
 Establishment of Mid-Atlantic was contemplated as the means to effect the purchase of Crass. In order to obtain the necessary capital, CVC persuaded two insurance companies-Prudential Insurance Company and Teachers Insurance & Annuity Company-to back Grisanti and Galef. Coca-Cola agreed that, if the group successfully acquired Crass, Coca-Cola would sell Baltimore Coke to them for $29.5 million and lend them $18 million. In return, Coca-Cola was to take a junior subordinated note for $47.5 million at twelve percent, with interest forgiven for the first three years, and amortization of the note beginning in the eleventh year. In addition, Coca-Cola agreed to spend approximately fifty-eight cents per gallon of syrup purchased by Mid-Atlantic for mutually agreeable advertising, promotion and merchandising programs. The anticipated value of the syrup rebate was approximately $17 million. Coca-Cola obtained the desired amendment of terms controlling the sales prices for syrup.
 
 
 6
 During the negotiations, Grisanti and Galef became interested in a permanent role in Mid-Atlantic, and Coca-Cola executives came to regard them as fully acceptable long-term owners of Mid-Atlantic. The parties therefore abandoned the early "parking" concept.
 
 
 7
 In November, 1979, Goldman Sachs conducted an auction sale of Crass, and the CVC group's bid of $157.5 million was the high bid. The transaction was completed on June 10, 1980, in accordance with the outlined terms, and Mid-Atlantic came into existence.
 
 
 8
 In its first year, Mid-Atlantic produced a nontaxable cash flow profit of $16.2 million, and an operating profit before interest and depreciation of $34.1 million. Taking into account interest, depreciation and year-end adjustments, the company had a book loss of.$2.7 million. During the same period, Allegheny's sales ($115.5 million) and profits ($16.6 million) reached record high levels.
 
 
 9
 On November 25, 1980, Allegheny filed suit against Mid-Atlantic, Coca-Cola, the Bottle Management Corporation,[2] Grisanti and Galef. The complaint alleged violations of Sections One and Two of the Sherman Act and the Robinson-Patman Act, as well as state and common law claims. Prior to trial Allegheny withdrew all but the Sherman Act claims, at the request of the district judge, in order to simplify the matter.
 
 
 10
 At trial, Allegheny attempted to show that the "parking" plan was a scheme orchestrated by Coca-Cola to drive Allegheny out of business. It argued that the terms of the transactions amounted to a $50 million contribution by Coca-Cola to Mid-Atlantic's "war chest," which it claimed ensured Coca-Cola's control over Mid-Atlantic and permitted Mid-Atlantic to cripple Allegheny by carrying out a predatory pricing campaign. Defendants argued in response that Mid-Atlantic never engaged in predatory pricing, that it would have been impossible in any event to drive Allegheny out of business, and that Allegheny had not incurred any antitrust injury.
 
 
 11
 The jury returned a verdict for the defendants. Allegheny argues on appeal that the district court's instructions to the jury were deficient, that evidence was improperly excluded by the court, and that the court's commentary on Allegheny's evidence, witnesses and counsel was improper. We consider first defendants' contention that, since Allegheny failed to prove that it suffered any antitrust injury, any error which may have occurred was harmless.
 
 II.
 
 12
 In order to recover treble damages under Section Four of the Clayton Act, 15 U.S.C. § 15, a plaintiff must prove "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original).[3] Allegheny sought to prove two types of injury: lost profits, and damage to its competitive position in the market.
 
 
 13
 With respect to lost profits, Dr. Bernard Norwood, an economist, testified that Allegheny's injury could be ascertained by comparing Allegheny's level of discounts-known in the industry as promotions-during the period from October, 1980 through September, 1981, after Mid-Atlantic's entry into the market, with the discounts during the previous year, before its entry. Under Dr. Norwood's theory, any deviation from the earlier level of discounts was attributable to Mid-Atlantic's presence in the market, and constituted antitrust injury.
 
 
 14
 The theory is flawed in several respects. First, the base period in the calculations-the year before Mid-Atlantic's entry into the market-was an abnormal period of reduced price competition. For a number of years, Allegheny and Crass had vigorously competed by various means, including promotions. In mid-1979, Crass commenced its efforts to find a purchaser, and both Allegheny and Crass raised prices and decreased promotions. Normal pricing and promotions were resumed in late 1980. Thus, from the first quarter of 1978 to the second quarter of 1979, promotions as a percentage of trade sales ranged from a low of 11.8% to a high of 17.2%. During the last two quarters of 1979 and the first three quarters of 1980-a period which includes Dr. Norwood's base period-the percentage dropped as low as 7.8% and never exceeded 11.8%. The ensuing increase in promotions, which Allegheny argued constituted antitrust injury, was not shown to represent anything other than a return to normal levels of competition. Cf. Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1351-53 (3d Cir. 1975) (damage computations were improperly based on prior years during which there was reduced competition); Farmington Dowel Products Co. v. Forster Mfg. Co., 421 F.2d 61, 83 (1st Cir. 1969) (calculation of going concern value of a company before it was driven out of business cannot be based on an arbitrary period); Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906, 912 (2d Cir. 1962), cert. denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962) (use of highest ratio of profits to sales ever experienced in calculating damages was improper).
 
 
 15
 Second, even assuming that the increase in promotions was to some extent caused by Mid-Atlantic's alleged predatory pricing, Allegheny made no attempt to show what part of the increase was caused by the predatory pricing. Dr. Norwood confirmed that his calculations simply did not consider whether Mid-Atlantic engaged in predatory pricing. An antitrust plaintiff is entitled to recover only for that portion of a price reduction caused by the defendants' unlawful conduct. See, e.g., Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 297 (2d Cir. 1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980) ("a purchaser may recover only for the price increment that 'flows from' the distortion of the market caused by the monopolist's anticompetitive conduct"); Coleman Motor Co. v. Chrysler Corp., supra, 525 F.2d at 1353 (rejecting damage figures which were "attributable at least in part to ... lawful competition"). Allegheny failed to show what part, if any, of the increase in discounts was attributable to Mid-Atlantic's alleged predatory pricing.
 
 
 16
 With respect to Allegheny's second theory-damage to its competitive position in the market-Allegheny sought to introduce the testimony of another expert, Dr. Alan Beckenstein, to the effect that Mid-Atlantic's presence in the market upset the competitive balance, and injured Allegheny. Dr. Beckenstein would have testified that Allegheny's damages should be measured by the benefits Mid-Atlantic received from Coca-Cola; since the infusion of money from Coca-Cola to Allegheny amounted to $45 million, the sum required to compensate for that infusion was, according to Dr. Beckenstein, $45 million.
 
 
 17
 For the same reason that the district court excluded the testimony, we hold that it was not sufficient to establish antitrust injury. In J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 561-63, 101 S.Ct. 1923, 1926-28, 68 L.Ed.2d 442 (1981), the Court rejected the argument that injury could be inferred from the fact of price discrimination. Allegheny's argument is precisely analogous. From the supposed fact that Coca-Cola assisted Mid-Atlantic, Allegheny asks us to infer that it was injured. The "automatic damages" argument is inconsistent with the statutory requirement of injury, and is foreclosed by Truett Payne.
 
 
 18
 In sum, Allegheny was entirely unable to show any injury which resulted from the defendants' alleged anticompetitive conduct. To the contrary, the uncontradicted evidence showed that during the period of alleged predatory pricing, Allegheny earned record profits.[4] Absent evidence of "an injury of the type the antitrust laws were designed to prevent," Brunswick, supra, 429 U.S. at 489, Allegheny is not entitled to invoke the treble damage remedy of Section Four of the Clayton Act.
 
 
 19
 Since Allegheny failed to establish an essential element in its case, any error which may have occurred was harmless. F.R.Civ.P. 61. See, e.g., Prebble v. Brodrick, 535 F.2d 605, 613 (10th Cir. 1976); Vecchio v. Anheuser-Busch, Inc., 328 F.2d 714, 719 (2d Cir. 1964), cert. denied, 379 U.S. 831, 85 S.Ct. 60, 13 L.Ed.2d 39 (1964). We therefore are not compelled to address the numerous claims asserted by Allegheny. We simply note in passing that the vast majority of Allegheny's arguments, particularly those assailing the demeanor and conduct of the district judge, were devoid of merit.[5]
 
 
 20
 Accordingly, the judgment of the district court is affirmed.
 
 
 21
 AFFIRMED.
 
 
 
 [1]
 The home market includes sales to supermarkets and grocery stores. The cold drink market includes products sold from coolers, vending machines and fountains
 
 
 [2]
 The Bottle Management Corporation is a holding company for the interest of Grisanti and Galef in Mid-Atlantic
 
 
 [3]
 Although the action for treble damages in Brunswick challenged the defendant's acquisitions under Section Seven of the Clayton Act, 15 U.S.C. § 18, the Court made clear that the requirement of antitrust injury applies to all actions for treble damages. The rule has been applied in a variety of contexts. See, e.g., Chrysler Corp. v. Fedders Corp., 643 F.2d 1229, 1234 (6th Cir. 1981), cert. denied, 454 U.S. 893, 102 S.Ct. 388, 70 L.Ed.2d 207 (1981) (Sherman Act Section One); BBD Transp. Co. v. Southern Pacific Transp. Co., 627 F.2d 170, 172 (9th Cir. 1980) (Sherman Act Section One); Lupia v. Stella D'Oro Biscuit Co., 586 F.2d 1163, 1167-69 (7th Cir. 1978), cert. denied, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979) (Robinson-Patman Act); Sargent-Welch Scientific Co. v. Ventron Corp., 567 F.2d 701, 709 (7th Cir. 1977), cert. denied, 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978) (Sherman Act Section Two)
 
 
 [4]
 Of course, a profitable company can prevail in an antitrust action by showing that the profits would have been even greater but for the anticompetitive conduct. Lee-Moore Oil Co. v. Union Oil Co., 599 F.2d 1299, 1304-05 (4th Cir. 1979). There must, however, be sufficient evidence that some profits were or would be lost by Allegheny as a result of defendants' unlawful actions for Lee-Moore to have any application. Allegheny's evidence did not establish that necessary ingredient
 
 
 [5]
 From the advantage of the calm and deliberate atmosphere of the appellate bench we can perceive with hindsight that the case need not have been submitted to the jury, defendants being entitled to a directed verdict. Hence the point is of no significance for the purposes of the case sub judice. Still we are somewhat troubled by the district court's instruction on the issue of intent. The jury was instructed:
 In order to find that the defendants are in violation of either Sections I or II of the Sherman Act it is necessary that you find that the defendants had the specific intent to do what the law forbids.
 In a Section One action, a plaintiff is not required to show specific intent. See United States v. United States Gypsum Co., 438 U.S. 422, 436 n.13, 98 S.Ct. 2864, 2873 n.13, 57 L.Ed.2d 854 (1978); United States v. Foley, 598 F.2d 1323, 1335, 1335 n.12 (4th Cir. 1979), cert. denied, 444 U.S. 1043, 100 S.Ct. 727, 62 L.Ed.2d 728 (1980). On the other hand, the court's Section One instruction made clear that "(a) conspiracy to fix prices is in and of itself an unreasonable restraint of trade." We do not decide whether the specific Section One instruction was sufficiently clear so that "the instructions, taken as a whole, fairly and adequately state the pertinent legal principles involved." Chavis v. Finnlines Ltd. O/Y, 576 F.2d 1072, 1076 (4th Cir. 1978). Nor do we intend to suggest that the instructions dealing with specific intent should serve as a model in subsequent cases.