**VIRGINIA PANEL CORPORATION,**
Plaintiff/Cross–Appellant,

v.

**MAC PANEL COMPANY,**
Defendant–Appellant.

**Nos. 96–1416, 96–1432.**

United States Court of Appeals,
Federal Circuit.

Dec. 30, 1997.

Rehearing Denied; Suggestion for
Rehearing In Banc Declined
Feb. 20, 1998.

Kenneth E. Krosin, Lowe, Price, LeBlanc & Becker, Alexandria, VA, argued for plaintiff-cross-appellant. With him on the brief were Timothy R. DeWitt and Harrie R. Samaras.

Thomas H. Jenkins, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., Washington, DC, argued for defendant-appellant. With him on the brief was Michael A. Morin. Of counsel on the brief were C. William Craycroft, McCutchen, Doyle, Brown & Enersen, L.L.P, San Jose, CA. Also on the brief were Dalbert U. Shefte, and Robert J. Walters, Shefte, Pinckney & Sawyer, L.L.P., Charlotte, NC. Of counsel was Gerson S. Panitch, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., Washington, DC.

Before LOURIE, Circuit Judge,
ARCHER, Senior Circuit Judge,* and
RADER, Circuit Judge.

* Senior Circuit Judge Glenn L. Archer, Jr. vacated the position of Chief Judge on December 24, 1997.

LOURIE, Circuit Judge.

MAC Panel Co. (MAC) appeals from the judgment of the United States District Court for the Western District of Virginia holding that MAC infringes U.S. Patent 4,329,005, owned by Virginia Panel Corp. (VP). *See Virginia Panel Corp. v. Mac Panel Co.*, 887 F.Supp. 880 (W.D.Va.1995) (*Virginia Panel I*). VP cross-appeals from the *Virginia Panel I* decisions to enhance damages for infringement by only ten percent and not to award attorney fees, and from the *Virginia Panel Corp. v. Mac Panel Co.*, Civ. A. No. 93–0006–H, 1996 WL 335381 (W.D.Va. May 29, 1996) (*Virginia Panel II*) decisions that VP engaged in patent misuse and violated the antitrust laws. Because the district court's error in submitting the construction of the '005 patent's claim language "reciprocating slide plates" to the jury was harmless and because the district court did not abuse its discretion by enhancing damages by only ten percent and refusing to award attorney fees, we affirm the *Virginia Panel I* decisions. However, because the district court erred in declining to grant judgment as a matter of law to VP on the patent misuse and antitrust claims, we reverse the *Virginia Panel II* decisions that VP engaged in patent misuse and violated the antitrust laws. We also modify the judgment to correct a plainly inadvertent error of the district court.

## BACKGROUND

VP owns the '005 patent, which is directed to a mechanism invented by VP employees for engaging an "interchangeable test adapter" (ITA) and a "receiver." As explained in the written description portion of the patent specification, ITAs and receivers are typically the two primary components of Automatic Test Equipment (ATE) used for the diagnostic testing of systems having thousands of electronic connections, such as airplane black boxes. To achieve a suitable precision engagement between the electrical contacts of the ITA and those of the receiver, the claimed mechanism requires that the ITA be suspended from "fixed hanger plates" on op-

posite sides of the receiver. Furthermore, the contacts of the ITA must be drawn into contact with the receiver contacts through "reciprocating" movement of "slide plates" relative to the hanger plates. Claim 1, which is the broadest independent claim at issue, reads as follows:

1. A mechanism for positioning a test adaptor in operative relationship with a receiver comprising [a] a receiver body,

[b] *fixed hanger plates* on opposite sides of the receiver body having spaced guide slots which are parallel and whose axes are normal to an electrical contact plane of the receiver,

[c] *reciprocating slide plates* on opposite sides of the receiver body extending adjacent to the fixed hanger plates and having spaced profiled cam slots including entrance positions parallel to said straight slots and adapted in one position of the slide plates to register with entrance portions of the straight slots,

[d] manually operable means on the receiver body to *reciprocate said slide plates in unison relative to the fixed hanger plates* between test adapter release and locking positions,

[e] a test adaptor including side members and pairs of spaced projecting locator elements on the side members ..., and

[f] said projecting locator elements each comprising a pair of side-by-side independent rollers....

(emphasis and paragraphing added).

MAC, VP's sole competitor in the relevant ATE market, makes an ITA/receiver interface which uses a "rotating latch mechanism" to push the ITA into contact with the receiver and to achieve proper alignment between the components' electrical contacts. After it became apparent that MAC was making significant inroads into VP's share of the ATE market in the mid–1980s and early 1990s, VP launched what it called a "Big MAC Attack." Apparently as part of this "attack," VP notified MAC's customers (including a number of government contractors and agencies) that it believed that certain MAC ITAs infringed the '005 patent, asked them to "cease and desist in using and selling such infringing items" and either implicitly or explicitly threatened suit. VP also notified its own customers, both old and new, that warranty service for VP parts would not be extended to VP parts that had been used with non-VP components. At about the same time, during contract negotiations with ASCOR, one of MAC's customers, VP proposed an exclusive license agreement under the '005 patent in which ASCOR would agree to purchase *all* ATE components, including a number of unpatented components, from VP, not MAC. Apparently on the advice of counsel, VP never entered into this agreement. In 1988, to further strengthen its market position, VP also became the sole source subcontractor under GE/Martin Marietta's Consolidated Automated Support System (CASS) Test Program Sets contract with the Navy.

In 1993, VP filed suit asserting that MAC willfully infringed the '005 patent (as well as U.S. Patent 4,655,530, which is not at issue in this appeal) and that MAC violated 15 U.S.C. § 1125(a) (1994), Lanham Act § 43(a), by falsely advertising that it had qualified as a supplier under the CASS contract. MAC defended on numerous grounds including invalidity and unenforceability, based on asserted misuse of the '005 patent; MAC also asserted antitrust and state false advertising counterclaims based in large part on VP's above-mentioned conduct. Following the parties' pre-trial motions, the district court granted summary judgment that MAC did not literally infringe the '005 patent, concluding that the "fixed hanger plate" limitation was not literally met. The court then bifurcated the proceedings into a standard "infringement" trial, in which infringement under the doctrine of equivalents was tried, and an "antitrust" trial. In the latter trial, both MAC's patent misuse defense and its antitrust counterclaims were tried, along with the parties' unfair competition and state false advertising claims.

In the infringement trial, the court submitted the question of the construction of "reciprocating slide plates" to the jury, which rendered a general verdict of contributory infringement and also found willfulness. The jury awarded approximately $1.2 million

in damages for infringement of the '005 patent and $20,300 for infringement of the '530 patent. The court reduced the damages based on an implied license, and decided to enhance damages by only ten percent; it declined to award VP attorney fees. *See Virginia Panel I*, 887 F.Supp. 880, 884–85 (1995).

In the antitrust trial, a different jury found that VP had misused the '005 patent and had violated both federal antitrust law and state false advertising law, and that MAC had not violated § 1125(a). In view of VP's misuse, the court vacated the infringement damages award. However, based on its finding that VP had purged its misuse by ceasing the above-mentioned practices and that the detrimental effects of VP's misuse had been dissipated, the court enjoined MAC's future manufacture, use, or sale of the receivers and ITAs adjudged to infringe the '005 patent and the modules adjudged to infringe the '530 patent, "for commercial non-governmental purposes." *Virginia Panel II*, 1996 WL 335381, at *11. The court then awarded MAC $456,666 in trebled antitrust damages, in addition to $913,332 in attorney fees and $157,928 in costs, but denied MAC's motion for future antitrust damages related to its loss of prospective CASS sales. *See id.* at *12–*13.

MAC appeals from the judgment that it infringed the '005 patent.[1] VP cross-appeals from the decisions to enhance damages by only ten percent and not to award attorney fees, as well as from the decisions that it engaged in patent misuse and violated the antitrust laws. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) (1994).

## DISCUSSION

### A. *Infringement*

We first address MAC's appeal from the decision that its sales of interface devices with a rotating latch mechanism constitute contributory infringement of the '005 patent. Prior to the infringement trial, the district court judge granted summary judgment that the MAC interface devices do not have "fixed hanger plates" and therefore do not literally infringe the patent. At trial, however, VP argued that the MAC devices infringe under the doctrine of equivalents because those devices (1) employ an equivalent of the claimed "fixed hanger plates" and (2) literally meet every other limitation, including the "reciprocating slide plates" limitation. The district court submitted to the jury, *inter alia*, the issue of the interpretation of the term "reciprocating slide plates." The jury rendered a general verdict of infringement of both the '005 and '530 patents one month prior to the issuance of our decision in *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 34 USPQ2d 1321 (Fed.Cir.1995) (in banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996), in which we held that claim construction should be decided by the court, not the jury, *see id.* at 979, 34 USPQ 1321, 1329 ("We therefore ... hold that in a case tried to a jury, the court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim.").

MAC moved for a new trial with regard to the '005 patent, citing *Markman* for the proposition that "submitting the issue of claim interpretation to the jury was a fundamental error requiring a new trial." *Virginia Panel I*, 887 F.Supp. at 889. The court denied MAC's motion on the ground that MAC had waived the issue when it failed to object to the court's earlier decision to submit the issue of claim interpretation to the jury, *id.* at 889–90, and alternatively on the ground that the asserted error was harmless. Regarding the latter ground, the court stated:

[I]n this case, the court's error, if any, in failing to instruct the jury as to the meaning of the claims, including the disputed terms "slide" and "reciprocate," is rendered harmless by the fact that the court's interpretation of the disputed claim terms would have been the same as the claim

---

1. MAC also appeals from the *Virginia Panel II* decisions that VP had purged its misuse and that MAC was not entitled to present evidence of future antitrust damages. However, in light of our reversal of the district court's erroneous patent misuse and antitrust decisions, we need not consider these issues.

interpretation that the jury must have used in finding the '005 patent infringed by [*sic.,* under] the doctrine of equivalents.

*Id.* at 890.

MAC argues that the court abused its discretion in refusing to grant a new trial in light of *Markman.* MAC contends that it did not waive the issue and that the error was prejudicial because (1) the court neglected its duty to interpret the disputed claim term and (2) without the court's guidance, the jury misinterpreted that term. MAC contends that according to the '005 patent, the "reciprocating slide plates" must move along a purely linear path. VP responds that, even assuming that MAC did not waive the issue, the error was harmless because the jury necessarily adopted the correct interpretation. VP contends that MAC's interpretation of "reciprocating slide plates" is an attempt to read a limitation from the preferred embodiment into the claims and is not supported by either the specification or the prosecution history.

We agree with VP that the court's failure to interpret the disputed claim term was harmless error.[2] The jury's verdict was necessarily premised on a conclusion that the claim term "reciprocating slide plates" is not limited to plates which move along purely linear paths. Because this interpretation is correct, we will not disturb the jury's verdict, even though the court erred in failing to interpret the disputed language, either pre-*Markman* before jury deliberation or post-*Markman,* after a post-trial motion. *See B. Braun Med., Inc. v. Abbott Lab.,* 124 F.3d 1419, 1423, 43 USPQ2d 1896, 1898–99 (Fed. Cir.1997) ("As to claim interpretation, we note that this case was submitted to the jury in 1994, before this court's opinion in *Markman* .... Because we agree with the jury's interpretation in this case, any error that the district court may have committed is harmless.").

A determination of infringement requires a two step analysis. "First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.,* 15 F.3d 1573, 1576, 27 USPQ2d 1836, 1839 (Fed.Cir. 1993). The first step is a question of law which we review *de novo,* the proper interpretation of a claim being based upon the claim language, the written description portion of the specification, the prosecution history, and, if necessary to aid the court's understanding of the patent, extrinsic evidence. *See Markman,* 52 F.3d at 979–81, 34 USPQ2d at 1329–31. Here, because the parties do not dispute the operational details of MAC's rotating latch devices, our analysis is limited to the interpretation of the claim language "reciprocating slide plates" and more precisely to determining whether that language is limited to plates which move linearly.

Contrary to MAC's arguments, the claims of the '005 patent do not indicate that the "slide plates" must move linearly. Rather, the claim phrases "adjacent to the fixed hanger plates" and "spaced profiled cam slots including entrance portions parallel to straight slots" refer only to the stationary position of the slide plates relative to the hanger plates, not to the paths traversed by the slide plates. Also, while the claim phrase "in unison relative to the fixed hanger plates" refers to the slide plates' motion, it does so without specifying whether that motion is linear or along a curved path.

Similarly, the other intrinsic evidence relied on by MAC does not indicate that the claimed "slide plates" must move linearly. The portions of the specification on which MAC relies, col. 3, lines 29–32, and col. 1, lines 44–46, do not even include the word "reciprocating."[3] These passages only state that the dry lube bearings and their pads are

---

**2.** Because we find the court's error harmless, we need not consider whether MAC waived the issue when it failed to object to the submission of the claim construction issue to the jury.

**3.** These passages state, respectively, that the "bearings have attached dry lube bearing pads to

minimize friction in the linear sliding movement of the slide plates on the receiver" and "[t]he slides also have dry lube elongated bearings for precision guidance with low friction during linear travel."

useful in reducing friction when and if the slide plates move linearly; they do not require the slide plates to move linearly. MAC's reliance on the absence of a drawing describing the non-linear motion of a slide plate is similarly unsound, for it is well-settled that device claims are not limited to devices which operate precisely as the embodiments described in detail in the patent. See SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1121, 227 USPQ 577, 585 (Fed.Cir.1985). Additionally, we note that MAC does not rely on any language in the prosecution history to support its argument that the "reciprocating" motion of the slide plates must be purely linear.

Thus, the intrinsic evidence does not require that the word "reciprocating" be interpreted differently from its ordinary meaning. See York Prods., Inc. v. Central Tractor Farm & Family Cent., 99 F.3d 1568, 1572, 40 USPQ2d 1619, 1622 (Fed.Cir.1996) ("Without an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning."). That ordinary meaning was established at trial; the uncontroverted evidence, including a recognized treatise, indicated that those skilled in the mechanical arts would have understood "reciprocating" to mean motion in which "a point traverses the same path and reverses its motion at the ends of such a path." Accordingly, because neither the '005 patent nor its prosecution history uses or implies a special definition for "reciprocating," the language "reciprocating slide plates" is not limited to plates that exhibit only linear motion, as opposed to the broader, ordinary meaning of that phrase. Thus, the disputed term literally encompasses rotating motion, such as that exhibited by the MAC mechanism.

Since the jury necessarily adopted the correct meaning of this claim language, we will not disturb the judgment of infringement. We thus affirm the judgment that the '005 patent was infringed.

B. *Enhanced Damages and Attorney Fees*

■ Following the *Virginia Panel I* trial in which the jury awarded VP $1,207,534 for MAC's infringement of the '005 patent and $20,300 for MAC's infringement of the '530 patent, VP moved for a trebling of damages under 35 U.S.C. § 284 (1994) and for attorney fees under 35 U.S.C. § 285 (1994). Upon consideration of several of the factors listed in *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 826–27, 23 USPQ2d 1426, 1435–36 (Fed. Cir.1992), the district court enhanced the damages award against MAC by ten percent. *Virginia Panel I,* 887 F.Supp. at 884–85. The court also concluded that "[t]he circumstances which mitigate against a large enhancement of damages also demonstrate why this is not an exceptional case up to this point" and accordingly refused to award attorney fees. *Id.* at 885. Following the *Virginia Panel II* trial, the court denied VP's renewed motion for treble damages and attorney fees, noting only that its earlier decision "is fortified by [MAC's] successful prosecution of its remaining counterclaims and defenses on the patent misuse, monopolization and attempted monopolization claims at the second phase of the trial." *Virginia Panel II,* 1996 WL 335381, at *1. As discussed below, we will reverse the decisions that VP engaged in patent misuse and violated the antitrust laws. Accordingly, since damages will be reinstated, we must independently evaluate the decisions to enhance damages against MAC by only ten percent and not to award attorney fees.

VP argues that the district court abused its discretion by disregarding the jury's finding of willfulness, citing *Jurgens v. CBK, Ltd.,* 80 F.3d 1566, 38 USPQ2d 1397 (Fed. Cir.1996), and by relying on irrelevant factors such as MAC's conduct in litigation and its financial condition. MAC responds that the jury's finding of willfulness does not mandate that damages be enhanced or that attorney fees be awarded. MAC also emphasizes that the district court exercised its discretion by considering the factors laid out in *Read,* and did not expressly reject the jury's finding of willfulness, as in *Jurgens.* We agree with MAC; the district court did not abuse its discretion in deciding to enhance the infringement damages by only ten percent, nor did it abuse its discretion in refusing to award attorney fees relating to the infringement suit.

■ Following a jury's determination that an infringement was willful, the extent of enhancement of damages is committed to the discretion of the trial court. 35 U.S.C. § 284 ("[T]he court *may* increase the damages up to three times the amount found or assessed."); *Read,* 970 F.2d at 826, 23 USPQ2d at 1435; *see also Graco, Inc. v. Binks Mfg. Co.,* 60 F.3d 785, 792, 35 USPQ2d 1255, 1260 (Fed.Cir.1995) ("Once a finding of willfulness has been made, the decision to enhance damages, up to three times the amount found, is discretionary."). Accordingly, we review the district court's decision to enhance damages by only ten percent for an abuse of discretion; the court's decision "will stand unless it was based on a clear error of fact, an error of law, or a manifest error of judgment." *National Presto Indus., Inc. v. West Bend Co.,* 76 F.3d 1185, 1193, 37 USPQ2d 1685, 1691 (Fed.Cir.1996).

■ "[W]hen a trial judge denies attorney fees in spite of a finding of willful infringement, the court must explain why the case is *not* 'exceptional' within the meaning of the statute." *Modine Mfg. Co. v. Allen Group, Inc.,* 917 F.2d 538, 543, 16 USPQ2d 1622, 1626 (Fed.Cir.1990) (citing *S.C. Johnson & Son, Inc. v. Carter–Wallace, Inc.,* 781 F.2d 198, 201, 228 USPQ 367, 369 (Fed.Cir. 1986)). Where such an explanation is provided, we review a court's decision not to award attorney fees for an abuse of discretion. *See National Presto,* 76 F.3d at 1197, 37 USPQ2d at 1693 ("The trial judge's discretion in the award of attorney fees permits the judge to weigh intangible as well as tangible factors: the degree of culpability of the infringer, the closeness of the question, litigation behavior, and any other factors whereby fee shifting may serve as an instrument of justice.").

The court found several facts, none of which is clearly erroneous, which justified enhancing damages by only ten percent and not awarding attorney fees, even in light of the jury's finding of willfulness. Specifically, the court first found that the factors considered by this court in *Bott v. Four Star Corp.,* 807 F.2d 1567, 1572, 1 USPQ2d 1210, 1213 (Fed.Cir.1986) favored MAC: (1) though willful, MAC's copying was "only" recklessly indifferent as opposed to deliberate,[4] (2) MAC conducted a marginally sufficient investigation of the asserted patents, albeit upon incomplete information, and (3) MAC's behavior as a party to the litigation was not unacceptable. *See* 887 F.Supp. at 885. The court also emphasized two factors deemed relevant in *Read,* 970 F.2d at 827–28, 23 USPQ2d at 1435–36, stating that: (4) "many of the issues in this case were close questions," and (5) "a large enhancement of damages could drive MAC out of business." 887 F.Supp. at 885. These factors, most notably the closeness of the case, justify the court's decision not to award attorney fees.

VP's reliance on *Jurgens* is misplaced. Unlike in *Jurgens,* the district court's factual findings are not inconsistent with the jury's finding of willfulness. The district court explicitly accepted the jury's finding of willfulness and carefully considered other "factors that are mitigating or ameliorating." *Read,* 970 F.2d at 826, 23 USPQ2d at 1435. As our case law makes clear, the consideration of such other factors is not necessarily reversible error.

Accordingly, we conclude that the district court's explanation for enhancing damages by only ten percent pursuant to § 284 was both reasonable and clearly expressed, as was its explanation for denying VP's motion for attorney fees under § 285. Because we discern no clear error in the court's factual findings and no abuse of discretion in its evaluation and weighing of the relevant factors, the court's decisions to enhance damages by only ten percent and not to award attorney fees are affirmed.[5]

---

4. As we have observed, " '[w]illfulness' in infringement, as in life, is not an all-or-nothing trait, but one of degree. It recognizes that infringement may range from unknowing, or accidental, to deliberate, or reckless, disregard of a patentee's legal rights." *Rite–Hite Corp. v. Kelley Co.,* 819 F.2d 1120, 1125, 2 USPQ2d 1915, 1919 (Fed.Cir.1987).

5. The parties agree that the district court inadvertently omitted from its final order the $20,300 in damages, plus a ten percent enhancement, for infringement of the '530 patent. In lieu of a remand, we will modify the final judgment pursuant to our authority under 28 U.S.C. § 2106 (1994) to include an additional $22,330 award against MAC.

## C. Patent Misuse

█ In the *Virginia Panel II* trial, MAC advanced four basic allegations of patent misuse: that VP (1) sent infringement notices, including requests to cease and desist infringing activities, to government contractors without informing those contractors of the affirmative defense provided by 28 U.S.C. § 1498 (1994),[6] (2) threatened to void its warranties on ITAs that were used with non-VP components, (3) proposed to ASCOR a licensing agreement conditioned on ASCOR's purchase of unpatented products, and (4) explicitly threatened to enforce its '005 patent against ASCOR and GDE Systems, even though those companies were government contractors subject to § 1498. At the close of the *Virginia Panel II* trial, the jury found that VP had misused its patents, including the '005 patent. In its post-trial order, the district court refused to set aside the jury verdict on VP's renewed motion for judgment as a matter of law (JMOL), concluding, *inter alia,* that "there·was evidence which, if believed by a reasonable jury, is sufficient to support a jury verdict on any of the four allegations [of misuse] advanced by [MAC]." *Virginia Panel II,* 1996 WL 335381, at *4. Specifically, the court pointed to VP's threats of suit implicit in the infringement letters and explicitly made to a GDE Systems representative, VP's threats to void express warranties, and the licensing proposal made to ASCOR. *Id.* Accordingly, the district court set aside the patent infringement damages it had earlier awarded to VP. *Id.* at *13.

VP argues that as a matter of law its conduct does not amount to patent misuse. It asserts that the infringement notices and threats of suit were proper because they were based on the good faith belief that its patents were being infringed and that those to whom it sent notices were not totally free from liability by virtue of § 1498. It also asserts that its other conduct cannot be characterized as patent misuse because none of it amounts to an attempt to extend the scope of its patents. MAC responds that VP's at-tempts to extend the effective scope of its patent rights were manifest in its concerted efforts to dominate the ATE market and accordingly that substantial evidence supports the jury verdict of misuse.

█ We agree with VP that none of the conduct on which MAC relied can constitute patent misuse as a matter of law. When reviewing a jury finding on an equitable issue normally reserved for the court such as patent misuse, *see Morton Salt Co. v. G.S. Suppiger Co.,* 314 U.S. 488, 490–91, 62 S.Ct. 402, 404, 86 L.Ed. 363, 52 USPQ 30, 32–33 (1942), we will first presume that the jury resolved the underlying factual disputes in favor of the verdict winner and leave those presumed findings undisturbed if they are supported by substantial evidence. Then, in a manner analogous to our review of legal conclusions, we examine the conclusion *de novo* to see whether it is correct in light of the jury fact findings. *See Jurgens v. McKasy,* 927 F.2d 1552, 1557, 18 USPQ2d 1031, 1035 (Fed.Cir. 1991). We conclude here that the jury's presumed fact findings cannot support its conclusion of patent misuse.

█ Patent misuse is an affirmative defense to an accusation of patent infringement, the successful assertion of which "requires that the alleged infringer show that the patentee has impermissibly broadened the 'physical or temporal scope' of the patent grant with anticompetitive effect." *Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1001, 228 USPQ 562, 566 (Fed.Cir.1986) (quoting *Blonder–Tongue Lab., Inc. v. University of Ill. Found.,* 402 U.S. 313, 343, 91 S.Ct. 1434, 1450, 28 L.Ed.2d 788, 169 USPQ 513, 525 (1971)); *see also USM Corp. v. SPS Technologies, Inc.,* 694 F.2d 505, 510, 216 USPQ 959, 963 (7th Cir.1982) ("[I]n application, the doctrine [of patent misuse] has largely been confined to a handful of specific practices by which the patentee seemed to be trying to 'extend' his patent grant beyond its statutory limits.").

---

**6.** Section 1498 provides, in relevant part: Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license ... the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.
28 U.S.C. § 1498(a) (1994).

The courts have identified certain specific practices as constituting *per se* patent misuse, including so-called "tying" arrangements in which a patentee conditions a license under the patent on the purchase of a separable, staple good, *see, e.g., Morton Salt Co.,* 314 U.S. at 491, 62 S.Ct. at 404, 86 L.Ed. 363, 52 USPQ 30, 33, and arrangements in which a patentee effectively extends the term of its patent by requiring post-expiration royalties, *see, e.g., Brulotte v. Thys Co.,* 379 U.S. 29, 33, 85 S.Ct. 176, 179, 13 L.Ed.2d 99, 143 USPQ 264, 266 (1964). Congress, however, has established that other specific practices may not support a finding of patent misuse. *See* 35 U.S.C. § 271(d) (1994); *Dawson Chem. Co. v. Rohm & Haas Co.,* 448 U.S. 176, 202, 100 S.Ct. 2601, 2616, 65 L.Ed.2d 696, 206 USPQ 385, 399 (1980) (construing earlier version of § 271(d)). A 1988 amendment to § 271(d) provides that, *inter alia,* in the absence of market power, even a tying arrangement does not constitute patent misuse. *See* 35 U.S.C. § 271(d)(5) (1994) (added by Pub.L. No. 100–703, § 201, 102 Stat. 4676 (1988)).

 When a practice alleged to constitute patent misuse is neither *per se* patent misuse nor specifically excluded from a misuse analysis by § 271(d), a court must determine if that practice is "reasonably within the patent grant, *i.e.,* that it relates to subject matter within the scope of the patent claims." *Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700, 708, 24 USPQ2d 1173, 1179–80 (Fed.Cir.1992). If so, the practice does not have the effect of broadening the scope of the patent claims and thus cannot constitute patent misuse. *Id.,* 976 F.2d at 708, 24 USPQ2d at 1180. If, on the other hand, the practice has the effect of extending the patentee's statutory rights and does so with an anti-competitive effect, that practice must then be analyzed in accordance with the "rule of reason." *Id.* Under the rule of reason, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Kahn,* —— U.S.

——, ——, 118 S.Ct. 275, 279, 139 L.Ed.2d 199 (1997) (citing *Arizona v. Maricopa County Med. Soc.,* 457 U.S. 332, 343 & n. 13, 102 S.Ct. 2466, 2472 & n. 13, 73 L.Ed.2d 48 (1982)).

VP's practices did not constitute patent misuse because they did not broaden the scope of its patent, either in terms of covered subject matter or temporally. That VP sent infringement notices to various government contractors, even notices that threatened suit and injunctions, did not indicate that VP attempted to broaden its patent monopoly. As we stated in *Mallinckrodt,* 976 F.2d at 709, 24 USPQ2d at 1180: "A patentee that has a good faith belief that its patents are being infringed violates no protected right when it so notifies infringers." Accordingly, a patentee must be allowed to make its rights known to a potential infringer so that the latter can determine whether to cease its allegedly infringing activities, negotiate a license if one is offered, or decide to run the risk of liability and/or the imposition of an injunction. *See Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 877, 228 USPQ 90, 101 (Fed.Cir.1985) (noting "the public policy of erecting a barrier against thwarting patentees from asserting legitimate patent rights"). That applies even to warning a company like MAC, that, at least in its role as a supplier to the United States, could not be subject to liability or enjoined from practicing the claimed invention.

While section 1498 clearly restricts a patentee's remedies against government contractors' infringing acts, it does not make those acts non-infringing and it certainly does not prohibit the sending of infringement notices to government contractors. The statute only provides an affirmative defense for applicable government contractors by establishing that, as to goods "used or manufactured by or for the United States," the contractor will not be liable for its infringing acts. 28 U.S.C. § 1498; *see also Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 554, 16 USPQ2d 1587, 1594 (Fed. Cir.1990) (noting that section 1498 is applied as "a codification of a defense").

Moreover, as VP accurately points out, the Federal Acquisition Regulations (FAR) explicitly contemplate that patentees will send infringement notices directly to contractors. The FAR provisions, which impose contractual obligations on government contractors, instruct contractors to notify their respective Contracting Officers "promptly and in reasonable detail [of] each notice or claim of patent ... infringement based on the performance of [the] contract." FAR § 52.227-2 (1996); see also 48 C.F.R. §§ 27.201-1 and 27.201-2 (1996).[7] The government has an interest in being notified of its potential liability. As reflected in the cited FAR provision, the contractor may be in the better position to receive the infringement notice and in turn notify the government. Consistent with the FAR, and based on its good faith belief that the government contractors were infringing its patent rights, VP was entitled to have sent such notices to government contractors that it had identified as users and sellers of MAC's infringing ITA/receiver interfaces.

Furthermore, even if the jury concluded that VP attempted to extend the remedial scope of its patents by sending infringement notices where no injunction could be obtained, such conduct did not violate the rule of reason. VP could not have been certain that the allegedly infringing devices were only to be used by the United States government. As VP points out, the record indicates that the allegedly infringing devices were typically used by government contractors for their own purposes and were often sold to foreign governments. Such devices were not subject to the provisions of section 1498. Only after the contractors received VP's notices of infringement could those contractors adequately evaluate whether they were immune from suit or would be subject to liability based on a contractual obligation to the government.

Accordingly, VP's threats to seek injunctions against MAC's customers, whether in the form of an infringement notice or in direct negotiations,[8] did not constitute patent misuse because VP had a good faith belief that those it notified were using a device that infringed the '005 patent. See 35 U.S.C. § 271(d)(3) ("No patent owner otherwise entitled to relief from infringement or contributory infringement of a patent shall be ... deemed guilty of misuse ... by reason of his having ... sought to enforce his patent rights against infringement or contributory infringement.").

■ VP also asserts that its threats to void or limit warranties did not constitute patent misuse, much less anti-competitive conduct. We agree. No case law or statute supports the decision of the district court. Such threats do not constitute tying or per se misuse. First of all, voiding a warranty, or threatening to do so, does not constitute use of a patent to control unpatented products. Voiding a warranty is not use of a patent at all. In addition, voiding a warranty on a product already sold, while possibly a breach of warranty, cannot be a tying arrangement because the purchaser is not deciding whether to buy a product. As for future sales, the threat is not to refuse to license, but only to limit a warranty, which is a matter of contract law between buyer and seller having no misuse implications. See, e.g., Northern Pac. Ry. v. United States, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–19, 2 L.Ed.2d 545 (1958) ("For our purposes a tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other suppli-

---

7. Also, 48 C.F.R. § 27.203 (1996) provides for the Contracting Officer to determine if and under what conditions the contractor shall indemnify the United States against liability for acts of patent infringement. Where the contract provides for such indemnification, the contractor would be poorly served by a rule prohibiting the sending of notices to government contractors. Moreover, a patentee cannot reasonably be expected to know if a particular infringing contractor will indemnify the government.

8. The district court referred to VP's "meetings with ASCOR and GDE Systems during which meetings [VP] allegedly threatened to enforce by suit the '005 patent," in refusing to overturn the jury's finding of misuse. Virginia Panel II, 1996 WL 335381, at *4. These direct threats no more constitute patent misuse than do the threats of suit in the aforementioned infringement notices.

er.") (emphasis added); *Stephen Jay Photography, Ltd. v. Olan Mills, Inc.,* 903 F.2d 988, 991 (4th Cir.1990) (stating that for an unlawful tying to exist, "the seller must coerce the buyer into *purchasing* the tied product") (emphasis added). *See also Marts v. Xerox, Inc.,* 77 F.3d 1109, 1111 (8th Cir.1996) (rejecting a tying argument based on warranty service as the tying product and copying cartridges as the tied product).

Moreover, threats to limit or void warranties presumably reflect a patentee's unwillingness to extend free repair or replacement services to usage of its product that it cannot control. Here, VP introduced ample unrefuted evidence that VP adopted its warranty policy based on the legitimate business purpose of protecting the integrity of its ITAs. Even MAC's president testified that damage may result when ATE components from different suppliers are mixed, and that determining which component caused the damage would be virtually impossible. Accordingly, VP's threats to void or limit the warranties on its ITAs also met the rule of reason test and thus were not acts of patent misuse.

■ Finally, VP's proposal to ASCOR was not a consummated tying arrangement and for that reason was not *per se* patent misuse. In contrast to *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129, 161 USPQ 577 (1969) and the other tying cases on which MAC relies, VP and ASCOR never entered into any license agreement that required AS-COR to purchase unpatented, staple goods. *See* 35 U.S.C. § 271(d)(5) (by implication, limiting tying arrangements to the conditioning of an actual license or sale of the patented product). Furthermore, because VP, on the advice of counsel, voluntarily and unilaterally revoked the proposal to link the license to the purchase of unpatented items, VP's activities did not extend the scope of its patent rights. Accordingly, we conclude that VP's truncated negotiations with ASCOR did not constitute patent misuse.

In sum, VP's allegedly predatory practices did not constitute patent misuse because they did not extend VP's patent rights nor were they unreasonable competitive practices. Accordingly, such practices were legally in-

sufficient to render the '005 patent unenforceable. The jury verdict that VP misused the '005 patent is therefore reversed and the district court is instructed to award damages to VP based on the adjudicated acts of infringement.

### D. *Antitrust*

■ At the close of the *Virginia Panel II* trial, the jury also found that VP had violated section 2 of the Sherman Act by monopolizing and attempting to monopolize the market for high-performance ATE general purpose interface devices, consisting of a receiver and an ITA, which the jury defined as the relevant market. The jury awarded MAC $152,-222 in damages. In its post-trial order, the district court trebled the damages and refused to set aside the jury verdict on VP's renewed motion for judgment as a matter of law (JMOL). The district court concluded, *inter alia,* that "there was ample evidence from which a reasonable jury could conclude that [MAC] suffered antitrust injury," noting that MAC "arrived at its actual lost profits by calculating the actual amount of lost sales over a nine-quarter period during which [MAC's] market share diminished in the relevant product market." The court also observed that it was "not convinced that the jury failed to consider the evidence that suggested that [MAC]'s loss of market share in the relevant product market was attributable to legitimate competitive factors," including the "effect of the 1988 CASS contract on market share and that [VP] increased its sales force threefold." 1996 WL 335381, at *7 & n. 4.

On appeal, VP argues, *inter alia,* that MAC failed to prove that any of its losses were attributable to illegal or anti-competitive activity, *i.e.,* so-called "antitrust injury." Specifically, VP argues that MAC's loss in market share is attributable to causes other than VP's infringement notices and threats to void warranties and, in any event, those activities are not illegal or anti-competitive. MAC responds that VP's activities were indeed anti-competitive, in violation of the antitrust laws, and that substantial evidence supports the jury's finding that VP's illegal activities caused MAC's injuries.

We agree with VP that MAC has not proven antitrust injury. We review a district court's denial of a post-trial motion for JMOL *de novo* by reapplying the standard applicable at the district court. Thus, this court

must determine whether there exists evidence of record upon which a jury might properly have returned a verdict in [the non-movant's] favor when *the correct legal standard is applied.* If there is not, [the movant] was entitled to have the question removed from the jury and decided as a matter of law.

*Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 975, 34 USPQ2d 1321, 1326 (Fed. Cir.1995) (in banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996) (quoting *Jamesbury Corp. v. Litton Indus. Prods., Inc.,* 756 F.2d 1556, 1560, 225 USPQ 253, 257 (Fed.Cir.1985)); *see also Garraghty v. Jordan,* 830 F.2d 1295, 1302 (4th Cir.1987) ("[W]hen the court finds no [substantial evidence supporting liability] a directed verdict is proper.").

When reviewing a district court's judgment involving federal antitrust law, we apply the law of the regional circuit in which that district court sits. *See Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 875, 228 USPQ 90, 99 (Fed.Cir.1985) ("We must approach a federal antitrust claim as would a court of appeals in the circuit of the district court whose judgment we review."). Accordingly, we apply Fourth Circuit antitrust law, which provides "that the antitrust plaintiff must demonstrate a causal connection between the defendant's violation and the damages claimed." *Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft,* 828 F.2d 1033, 1043–44 (4th Cir.1987); *see also Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 698, 50 L.Ed.2d 701 (1977) ("Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."); *Allegheny Pepsi–Cola Bottling Co. v. Mid–Atlantic Coca–Cola Bottling Co.,* 690 F.2d 411, 414–15 (4th Cir.1982) (affirming judgment of lack of antitrust violation on ground that Allegheny "failed to prove that it suffered any antitrust injury" because it "failed to show what part, if any, of the increase in discounts was attributable to Mid–Atlantic's alleged predatory pricing").

We note first that violation of the antitrust laws, in this case section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2 (1994), requires more exacting proof than suffices to demonstrate patent misuse. For example, violation of the antitrust laws always requires an intent to monopolize, market power in a defined relevant market (which may be broader than that defined by the patent), and damages attributable to the conduct asserted to be in violation of the antitrust laws. *See, e.g., Zenith Radio Corp.,* 395 U.S. at 140–41, 89 S.Ct. at 1585–86, 23 L.Ed.2d 129, 161 USPQ 577, 593. At the very least, we agree with VP that substantial record evidence does not support a finding that MAC's alleged losses were attributable to conduct forbidden by the antitrust laws. MAC's principal evidence regarding causation was a graph of the parties' respective shares of the high-performance ATE general purpose interface market and the testimony of Mr. Daniel Friedman and Dr. William Wood, interpreting that graph. Both explained that the graph exhibited MAC's steady loss of market share, which began in the third quarter of 1992 and continued through the third quarter of 1994, and attributed that loss to VP's contemporaneous sending of infringement notices and VP's "product advisories" regarding its warranties. However, as we have held, *supra,* the conduct relied on by Friedman and Wood was not legally improper. Accordingly, the evidence on which MAC relies fails to "demonstrate a causal connection between the defendant's violation and the damages claimed." *Metrix,* 828 F.2d at 1044. Because there were no violations by VP in this case, Friedman and Wood's analyses cannot support imposing antitrust damages against VP.[9]

---

9. MAC also presented the testimony of (1) its president who stated that VP's warranty policies led MAC customers to express concern over using MAC components and (2) *one* customer who actually returned an ITA purchased from MAC as a result of VP's warranty policies. In light of our analysis of the principal evidence, we deem this

Moreover, the evidence of record incontestably points to an alternate cause of MAC's loss in market share, *viz.*, VP's sales under the CASS contract. Based on the evidence of this alternative cause of MAC's loss of market share, the jury could not reasonably have relied on Friedman and Wood's analysis. *See, e.g., Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1494–95 (8th Cir.1992) ("When a plaintiff improperly attributes all losses to a defendant's illegal acts, *despite the presence of significant other factors*, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage. This is precisely the type of speculation or guesswork not permitted for antitrust jury verdicts.") (emphasis added) (quoting *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d 1081, 1162 (7th Cir.1983) (internal quotation omitted)). Both Friedman and Wood conceded that they did not consider the effect of VP's sales to GE/Martin Marietta under the CASS contract because, as Friedman stated, that contract was signed "quite some time" before MAC's relevant loss in market share. However, when VP's sales under the CASS contract (the bulk of which occurred when GE/Martin Marietta exercised its contractual option in 1992) are excluded from the analysis of the relevant market, MAC's apparent market share actually increased over the nine-quarter period at issue. Thus, the correspondence between VP's increased sales under the CASS contract and MAC's loss of market share is readily apparent, even though the contract was awarded years before MAC lost market share. Because no substantial evidence supports the antitrust verdict, VP's motion for JMOL should have been granted.

The court in effect attempted to bootstrap its misuse analysis to support the jury's attempted monopolization verdict, and specifically to support the jury's finding that VP had the requisite specific intent to monopo-lize. In denying VP's motion to set aside the antitrust verdict, the court concluded that

> the jury could have inferred that [VP] possessed anti-competitive intent by engaging in the conduct constituting patent misuse: the sending of threatening infringement notices; the threatening to void warranties; and the exploiting of its patented products to achieve increased sales of its unpatented products. Consequently, the court finds that a reasonable jury could have concluded that [VP] formed the specific intent to monopolize the relevant product market because there were questions regarding the quality of [VP] products and because [VP] engaged in specified conduct shown to constitute patent misuse from which conduct intent to monopolize may have been reasonably inferred.

*Virginia Panel II*, 1996 WL 335381, at *7. However, conduct that is insufficient to support a misuse defense cannot support an otherwise flawed antitrust judgment. Accordingly, because we determine that the conduct underlying the allegations of misuse does not amount to patent misuse, the same conduct cannot support a judgment that VP's conduct violated the Sherman Act.

The antitrust laws do not preclude patentees from putting suspected infringers on notice of suspected infringement. *See Mallinckrodt*, 976 F.2d at 709, 24 USPQ2d at 1180 ("A patentee that has a good faith belief that its patents are being infringed violates no protected right when it so notifies infringers."). Rather, they are designed to promote competition to the advantage of consumers, not for the protection of competitors. *See Brunswick Corp.*, 429 U.S. at 488, 97 S.Ct. at 697 ("The antitrust laws, however, were enacted for 'the protection of competition, not competitors.'") (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). Thus, a patentee may lawfully police a market that is effectively defined by its patent.[10] Similarly,

---

anecdotal evidence to be insubstantial and insignificant.

10. Although the relevant product market was not expressly defined to include only products covered by the '005 patent, both parties emphasized that the findings of monopolization and attempt-ed monopolization were premised exclusively on MAC's lost sales of receivers and ITAs adjudged to infringe the '005 patent. Accordingly, the '005 patent effectively defined the relevant product market for purposes of MAC's alleged antitrust injury.

the antitrust laws are not designed to penalize an individual who lawfully obtains a government procurement contract, even if the award of that contract dramatically and necessarily altered a two-supplier market. While the district court and the jury viewed VP's aggressive conduct as anti-competitive and as the cause of MAC's market losses, VP's enforcement of the patent rights was not unlawful.

Accordingly, we reverse the judgment that VP violated the Sherman Act through monopolization and attempted monopolization of the high-performance ATE general purpose interface market.

## CONCLUSION

The district court did not err in refusing to grant MAC's motion for a new infringement trial because its error in submitting the construction of the claim term "reciprocating slide plates" to the jury was harmless. Also, because the district court neither abused its discretion nor disregarded the jury's finding of willfulness in enhancing damages by only ten percent or in refusing to award attorney fees, we affirm those decisions. However, because the district court should have granted VP's motion for JMOL on the ground that VP's conduct did not extend the scope of the patent or cause MAC's loss of market share, we reverse the decisions that VP engaged in patent misuse and violated the antitrust laws. We modify the judgment to correct the district court's failure to assess damages for the willful infringement of the '530 patent.

## COSTS

No costs.

*AFFIRMED-IN-PART, REVERSED-IN-PART,* and *MODIFIED.*